# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

LORRAINE GARCIA,

       **Plaintiff,**

v.                                   **No. CIV-15-0111 LAM**

CAROLYN W. COLVIN, Acting Commissioner
of the Social Security Administration,

       **Defendant.**

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Plaintiff's ***Motion to Reverse and Remand for a Rehearing with Supporting Memorandum*** (*Doc. 19*), filed September 29, 2015 (hereinafter "motion").   On December 31, 2015, Defendant filed a response to Plaintiff's motion (*Doc. 23*) and, on January 14, 2016, Plaintiff filed a reply (*Doc. 25*).   In accordance with 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(b), the parties have consented to the undersigned United States Magistrate Judge to conduct all proceedings and enter a final judgment in this case. *See* [*Docs. 4* and *7*].   The Court has considered Plaintiff's motion, Defendant's response, Plaintiff's reply, and the relevant law.   Additionally, the Court has meticulously reviewed and considered the entire administrative record.   [*Doc. 15*].   For the reasons set forth below, the Court **FINDS** that Plaintiff's motion should be **GRANTED in part** and the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") should be **REMANDED**.

# I.   Procedural History

On April 8, 2011, Plaintiff filed an application for Disability Insurance Benefits (hereinafter "DIB"), alleging that she became disabled on March 9, 2011.   [*Doc. 15-8* at 2-9]. Plaintiff claimed that she became disabled due to high blood pressure, sleep apnea, right-side hearing loss, nerve damage to her left leg, back injury, depression, a broken hand, and a heart murmur.   [*Doc. 15-8* at 3].   Her DIB application was denied at the initial level on September 22, 2011 (*Doc. 15-5* at 2-3), and at the reconsideration level on June 19, 2012 (*id.* at 4-23).   Pursuant to Plaintiff's request (*Doc. 15-6* at 12-13), Administrative Law Judge Ann Farris (hereinafter "ALJ") conducted a hearing on November 5, 2013.   [*Doc. 15-4* at 2-59].   At the hearing, Plaintiff was present, represented by her previous attorney, Michael F. Hacker, and testified.   *Id.* at 2, 9-50.   Vocational Expert (hereinafter "VE") Leslie J. White was also present and testified.   *Id.* at 2, 51-59.

On January 31, 2014, the ALJ issued her decision, finding that, under the relevant sections of the Social Security Act, Plaintiff was not disabled through the date of the decision.   [*Doc. 15-3* at 20-33].   Plaintiff requested that the Appeals Council review the ALJ's decision.   *Id.* at 15. By order dated December 18, 2014, the Appeals Council denied Plaintiff's request for review on the ground that there was "no reason under our rules to review the [ALJ]'s decision."   *Id.* at 2. This decision was the final decision of the Commissioner.   On February 6, 2015, Plaintiff filed her complaint in this case.   [*Doc. 1*].

# II.   Standard of Review

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether the correct legal standards were applied.

*Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (citing *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992)). If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands, and the plaintiff is not entitled to relief. *See Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003). Courts should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. *Hamlin*, 365 F.3d at 1214; *Langley*, 373 F.3d at 1118.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*, 365 F.3d at 1214 (citation and quotation marks omitted); *Doyal*, 331 F.3d at 760 (citation and quotation marks omitted). An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*, 365 F.3d at 1214 (citation and quotation marks omitted). While a court may not re-weigh the evidence or try the issues *de novo*, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005) (citations omitted). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ]'s findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

### III. Applicable Law and Sequential Evaluation Process

For purposes of DIB, a person establishes a disability when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). In light of this definition for disability, a five-step sequential evaluation process (hereinafter "SEP") has been established for evaluating a disability claim. 20 C.F.R. §§ 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the SEP, the claimant has the burden to show that: (1) the claimant is not engaged in "substantial gainful activity;" and (2) the claimant has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and either (3) the claimant's impairment(s) either meet(s) or equal(s) one of the "Listings" of presumptively disabling impairments; or (4) the claimant is unable to perform her "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(i–iv); *Grogan*, 399 F.3d at 1261. At the fifth step of the evaluation process, the burden of proof shifts to the Commissioner to show that the claimant is able to perform other work in the national economy, considering her residual functional capacity (hereinafter "RFC"), age, education, and work experience. *Grogan*, 399 F.3d at 1261.

### IV.  Plaintiff's Age, Education, Work Experience, and Medical History; and the ALJ's Decision

Plaintiff was born on March 21, 1960, and was 50 years old on March 9, 2011, the alleged onset of disability date. [*Doc. 15-7* at 4]. The highest level of education that Plaintiff completed was tenth grade. [*Doc. 15-8* at 4, ¶ 5.A]. Prior to her alleged disability, Plaintiff had worked

primarily as a cook or food handler in nursing home, school, and day care settings.  *Id.* at 23. Plaintiff claims she had to stop working on March 9, 2011 because she broke her hand and her boss did not want her working with a broken hand.  *Id.* at 3.

Plaintiff's medical records include:  a January 1997 Comprehensive Functional Capacity Evaluation from the Work Performance Center (*Doc. 15-10* at 2-5); treatment records from the University of New Mexico Health Sciences Center, covering the period from April 2010 through October 2013 (Exs. 2F (*Doc. 15-11* at 4 through *Doc. 15-13* at 9), 8F (*Doc. 15-15* at 4 through *Doc. 15-17* at 2), 9F (*Doc. 15-17* at 5-28), 10F (*Id.* at 30), 13F (*Doc. 15-18* at 4-36) 15F (*Id.* at 42-51), and  17F–20F (*Doc. 15-20* at 2 through *Doc. 15-25* at 39)); a Psychiatric Review Technique, dated September 15, 2011 by Thomas VanHoose, Ph.D. (*Doc. 15-13* at 12-22); a Physical RFC Assessment, dated September 22, 2011, by Karen Schnute, M.D. (*Id.* at 23-28); a Consultative Examination Report, dated March 7, 2012, by JoAn Rittenhouse, Ph.D. (*Doc. 15-17* at 31-34); an Anxiety Listings Questionnaire, dated December 16, 2013, by Christopher Neumann, Ph.D. (*Doc. 15-25* at 42  45); and a Depression Listings Questionnaire, dated December 16, 2013, by Christopher A. Neumann, Ph.D. (*Id.* at 48  52).  Where relevant, Plaintiff's medical records are discussed in more detail below.

Plaintiff has a long history of both physical and mental difficulties.  Most significantly, Plaintiff has lower back problems, knee problems, and severe depression.  Although she stopped working full-time in March 2011, she sometimes worked part-time after the date claimed as the onset of her disability.  At the time of the hearing in November 2013, Plaintiff lived with her mother and her 24-year old daughter, and worked approximately five hours a day as a cook for a small Christian school.

Plaintiff first injured her back in 1997 in a work-related accident.   [*Doc. 15-10* at 4].   She has complained of chronic lower back pain since that event.   In June 2011, x-rays of Plaintiff's lower (lumbar) spine indicated some abnormalities.   [*Doc. 15-15* at 15].   Plaintiff's lumbar pain continued and increased, and she was referred to physical therapy by her primary care provider in March 2012.   [*Doc. 15-18* at 31].   A September 2013 MRI indicated "severe bilateral facet hypertrophy at L5-S1 resulting in grade 1 anterior spondylolisthesis, moderate spinal canal stenosis, and moderate bilateral neural foraminal narrowing."   [*Doc. 15-25* at 36].   Essentially, Plaintiff's lower spine had shifted, the joints had enlarged, and the passageways for nerves had narrowed, resulting in increased pressure on those nerves.   Plaintiff had also suffered a left hand/wrist injury when she fell off of a bed in February 2011, shortly before her claimed onset date.   [*Doc. 15-11* at 33-34].   Although this injury caused Plaintiff significant pain, it was ultimately resolved by compartment release surgery in August 2011.   [*Doc. 15-16* at 5, 10-12].

Plaintiff injured her left knee in late October 2011, and was seen for knee pain in the Emergency Room in November 2011 [*Doc. 15-15* at 24].   X-rays taken in the E.R. indicated arthritis, and Plaintiff was diagnosed with a knee sprain.   *Id*. at 25.   However, the pain continued, and an MRI in February 2012 (*Doc. 15-18* at 34-36) revealed a complex tear of the medial meniscus of the left knee, among other issues, which caused "significant pain and functional limitation."   *Id*. at 43.   After physical therapy failed to improve the knee, Plaintff had surgery on it in May 2012.   *Id*. at 48-50.   That surgery, as was the wrist surgery, was successful in resolving Plaintiff's left knee issues.   *Id*. at 46.   However, Plaintiff injured her right knee in October 2013 in an aerobics class.   [*Doc. 15-25* at 9-13].   The damage to Plaintiff's right knee was similar to

the damage she had suffered to her left knee, but the right knee was still an issue for Plaintiff at the time of the ALJ hearing the following month.   [*Doc. 15-4* at 44-45].

Plaintiff also has a lengthy history of depression and anxiety, for which she was prescribed Zoloft and Wellbutrin and which she was taking well before her claimed onset of disability date. *See* [*Doc. 15-11* at 49-50].   She was hospitalized for three days in October 2012, following an intentional overdose of prescribed medications, and was thereafter referred to the University of New Mexico Mental Health Center (hereinafter "UNMH").   [*Doc. 15-20* at 31-33].   The doctors at UNMH diagnosed Plaintiff with "Major depressive disorder, recurrent, severe; generalized anxiety disorder," and "Cluster B personality features,[1] rule out borderline personality disorder," and made various efforts to adjust her medications to obtain optimal therapeutic results. [*Doc. 15-20* at 20].   In November 2012, Plaintiff began attending psychotherapy sessions at the Department of Family and Community Medicine with Cheri Koinis, Ph.D. (Doc. 15-20 at 2-3, 7-8), then transitioned to Christopher A. Neumann, Ph.D. in February 2013 (*Doc. 15-24* at 18).

At step one of the five-step evaluation process the ALJ found that Plaintiff "has not engaged in substantial gainful activity" since her alleged disability onset date of March 9 2011. [*Doc. 15-3* at 22].   At step two, the ALJ found that Plaintiff has the following severe medically determinable impairments:   "degenerative disc disease of the lumbar spine at L5-S1, meniscus tear of the left knee, depression, anxiety, and a personality disorder with cluster B traits."   *Id*.

---

[1] "Cluster B" is a classification of personality disorders, including Borderline Personality Disorder, which "is called the dramatic, emotional, and erratic cluster," and its disorders "share problems with impulse control and emotional regulation."   https://www.mentalhelp.net/articles/dsm-5-the-ten-personality-disorders-cluster-b/ (site last visited on May 10, 2016).

The ALJ also found that Plaintiff has the following non-severe impairments: "hypertension, hearing loss, and obstructive sleep apnea." *Id*. At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the Listings found in 20 C.F.R. § 404, Subpt. P, App'x. 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). *Id*. at 23. The ALJ also found that Plaintiff had mild restriction of her activities of daily living, moderate difficulties with social functioning, and moderate difficulties with concentration, persistence or pace, and that Plaintiff "has experienced one to two episodes of decompensation, each of extended duration." *Id*. at 24. On that basis, the ALJ determined that Plaintiff's mental impairments did not satisfy the paragraph B or paragraph C criteria for Listings 12.04 or 12.06. *Id*.

Before step four, the ALJ determined that Plaintiff had the RFC:

[T]o perform light work as defined in 20 C.F.R. 404.1567(b) except that she can only occasionally balance, stoop, and climb stairs; should never kneel, crouch, crawl, or climb ropes, ladders, or scaffolds; can make simple work-related decisions with few workplace changes; and can have occasional and superficial interaction with the public and coworkers.

[*Doc. 15-3* at 25]. In support of her RFC assessment, the ALJ found that Plaintiff's "medically determinable impairments might be expected to cause some of the alleged symptoms; however, the [Plaintiff]'s statements concerning the intensity, persistence and limiting effects of these

symptoms are not entirely credible." *Id*. at 26.   The ALJ also noted that she had considered the effects of obesity in her determination of Plaintiff's RFC.[2]   *Id*. at 28.

At the fifth and final step, the ALJ noted that Plaintiff was born on March 21, 1960, and was therefore 50 years old on the alleged disability onset date, which is considered to be an individual "closely approaching advanced age" under 20 C.F.R. §§ 404.1563(d) (defining the age range for such individuals as "50-54").   [*Doc. 15-3* at 31].   The ALJ found that Plaintiff has at least a high school education,[3] and is able to communicate in English, but "is unable to perform any past relevant work."   *Id*.   However, the ALJ stated that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [Plaintiff] is 'not disabled,' whether or not [she] has

---

[2] The ALJ apparently believes that simply including this statement in her decision satisfies her duty to "consider" Plaintiff's obesity, as no actual discussion of the effects of obesity was offered.   However, the Social Security Administration specifically directs ALJs "to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the [SEP], including when assessing an individual's [RFC]."   Soc. Sec. Rep. 02-1P, 2002 WL 34686281, at *1 (2002).   A BMI of 40 or more, such as Plaintiff's, is considered "extreme" obesity, which involves "the greatest risk for developing obesity-related impairments."   *Id*. at *2.   Moreover, "[t]he effects of obesity may not be obvious.   For example, some people with obesity also have sleep apnea," as does Plaintiff, which "can lead to drowsiness and lack of mental clarity during the day.   Obesity may also affect an individual's social functioning."   *Id*. at *6.   Thus, "[i]ndividuals with obesity may have problems with the ability to sustain a function over time," and the "RFC assessment must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," which is 8 hours per day, 5 days per week, or an equivalent schedule.   *Id*.   "In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity.   This may be particularly true in cases involving sleep apnea."   *Id*.   Finally, "[o]besity may also cause or contribute to mental impairments such as depression."   *Id*. at *3.   Each of the foregoing statements appears, on its face, to apply to Plaintiff and to trigger the ALJ's duty to "do an individualized assessment of the impact of obesity on [Plaintiff]'s functioning."   *Id*. at *4.   The ALJ's failure to discuss any of these specific impacts of obesity and how they may or may not affect Plaintiff indicates that, despite her claim, she did not truly "consider the effects of [Plaintiff's] obesity" in reaching her conclusion that Plaintiff is not disabled.

[3] Plaintiff actually has only a partial high school education, but did obtain a GED.   *See* [*Doc. 15-8* at 4; *Doc. 15-4* at 29].

transferable job skills."   *Id*.   Noting that Plaintiff's ability to perform the full range of light work

"has been impeded by additional limitations," the ALJ asked the VE to determine "whether jobs

exist in the national economy for an individual with the [Plaintiff]'s age, education, work

experience, and [RFC]."   *Id*. at 32.   The VE testified that such an individual "would be able to

perform the requirements of representative occupations such as:" cleaner/housekeeper

(DOT 323.687-014),[4] cleaner/polisher (DOT 709.687-010), and advertising material distributor

(DOT 230.687-010), all of which are considered "light, unskilled work."   *Id*.   Based on the VE's

testimony, and considering Plaintiff's age, education, work experience, and RFC, the ALJ found

that jobs exist in significant numbers in the national economy that Plaintiff can perform.   *Id*.   The

ALJ stated that she "ha[d] determined that the [VE]'s testimony is consistent with the information

contained in the [DOT]," and concluded that Plaintiff "is capable of making a successful

adjustment to other work that exists in significant numbers in the national economy."   *Id*.

Therefore, the ALJ determined that Plaintiff was not disabled within the meaning of the Social

Security Act from March 9, 2011 to the date of the decision.   *Id.*

## V.   Analysis

Plaintiff makes three claims in her motion to reverse or remand, which are that the ALJ:

(1) mischaracterized the evidence upon which she made her credibility assessment; (2) ignored

parts of the opinion of non-examining expert, Dr. Gelinas; and (3) improperly evaluated the

---

[4] "DOT" stands for Dictionary of Occupational Titles.

medical opinions of Drs. Neumann and Rittenhouse.  [*Doc. 19* at 2].  In response, Defendant argues that the ALJ reasonably evaluated the medical evidence and Plaintiff's subjective complaints in determining her RFC.  [*Doc.* 23 at 6].  In her reply brief, Plaintiff argues that Defendant failed to directly address the claims in her motion.  [*Doc. 25* at 4].

### A.   The ALJ's Credibility Assessment

In reaching the conclusion that Plaintiff is not disabled, the ALJ appears to have relied more heavily on her assessment of Plaintiff's credibility than on the medical evidence itself.  Unfortunately, that assessment was based on the ALJ's somewhat misleading selection of "activities" that create an impression that Plaintiff is more active than she claimed:

> Despite her allegations of severe limitations, [Plaintiff] has described activities consistent with a higher level of functioning.  She needs no assistance with personal care and does light household chores such as making her bed and laundry [*Doc. 15-8* at 61-68].[5]  She even reported planning to do a 5K with her daughters [*Doc. 15-23* at 22].  The medical records indicate [Plaintiff] walks, bikes, and has taken aerobics [*Doc. 15-25* at 5, 10], [*Doc. 15-17* at 22], [*Doc. 15-23* at 22]).  Moreover, at the hearing, she admitted to doing yoga.  In addition, [Plaintiff] has worked part-time throughout most of the alleged period of disability.  In November 2011, she was working in a daycare center [*Doc. 15-15* at 24].  In October 2013, she was working in a church [*Doc. 15-25* at 11].  In addition, [Plaintiff] has admitted to caring for her nieces 40 hours a week [*Doc. 15-23* at 22].

---

[5] It has long been held that "sporadic performance of household tasks or work does not establish that a person is capable of engaging in substantial gainful activity."  *Bright v. Astrue*, No. 08-1196-MLB, 2009 WL 1580308, at *4 (D. Kan. June 4, 2009) (unpublished), citing *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993) ("ALJ may not rely on minimal daily activities as substantial evidence that a claimant does not suffer disabling pain").  This principle certainly appears to apply to Plaintiff's household activities, which even the ALJ describes as "light household chores."

> While these activities were not performed at substantial gainful activity levels, they
> are no [sic] consistent with the physical and mental limitations alleged.

*Doc. 15-3* at 29.

Many of the foregoing activities were taken from a single treatment note in the midst of

Plaintiff's long medical record, which took place on a day when Plaintiff was obviously feeling

very positive.   *See* [*Doc. 15-23* at 22].   After a visit with Plaintiff on April 26, 2013, Christina N.

Doucette, P.A.-C, Plaintiff's long-term primary health care provider, described several changes

that had been made to Plaintiff's medications since she'd seen her last, and observed that:

> [Plaintiff] notes since I last saw her she was terminated from her [employment].
> The day she saw me, she went to work, she handed the doctor's note and they stated
> it was not going to work out and she was let go.   She states initially she was upset
> but feels it was for the [best].   Now she is watching her nieces and that is going
> well.   She does [that] Monday[] through Friday 40 hours a week.   She finds the
> girls to be entertaining and is enjoying watching them. Throughout the visit today
> she is telling stories, expressed interest in what the girls she was watching were
> doing, notes she started playing a game called Candy Cr[u]sh and is enjoying this,
> looking forward to going and beating the next level.   When I saw her last [on
> March 29, 2013] she was expressing suicidal ideation, thoughts of hurting herself.
> She notes her psychiatrist recommended massaging her fingers when she is
> stressed.   This does help.   She has not tried to harm herself.   She denies any
> suicidal or homicidal ideation today.   She has been doing portion control and
> exercising.   She is planning to do 5K walk with her daughters and expresses
> enjoyment with this.

*Id*. at 29.   In her conclusion, Ms. Doucette noted that she had seen "some positive improvements

today," and that Plaintiff "expresses more interest and motivation today," as well.   *Id*. at 30.

Both Shanna V. Diaz, D.O., one of Plaintiff's treating psychiatrists, and Christopher A. Neumann,

Ph.D., her treating psychologist, had noted similarly positive changes in Plaintiff on

April 17, 2013.   *Id*. at 33-36.

12

However, by May 3, 2013, one week after her visit with Ms. Doucette, Plaintiff's mental status had changed dramatically.   From a visit with Plaintiff on that day, Dr. Diaz described Plaintiff's thought content as:

> Significant for continuing to feel tired and rundown and sleeping too much, but also feeling more anxious with passive suicidal ideation since starting fluoxetine. Continues to endorse intermittent strong desire for self-harm, also continuing to endorse absentmindedly hurting herself and not realizing it until later.   Denies auditory or visual hallucinations.   No delusions endorsed or elicited.

*Doc. 15-23* at 20.   Dr. Diaz noted that Plaintiff reported that she had been crying on and off since the previous day, wanted to discontinue her fluoxetine, had had periods of feeling afraid, had rubbed the skin off her face with a Brillo pad, had been pinching her leg and leaving small bruises, and that "she is tired of feeling this way and relating that 'all the good jobs I've had with good bosses and nice people have ended when my depression hits.'"   *Id*. at 19.   Plaintiff's fluoxetine was changed by Dr. Diaz to Effexor at this visit, and her mood continued to appear relatively stable from that time into July 2013.   *Id.*; *see also*, *id*. at 2, 4-7, 8, 10-12, and 18.

In August 2013, Plaintiff saw Ms. Doucette for low back pain, which Plaintiff described as "across her back and radiat[ing] down to behind her knees."   [*Doc. 15-25* at 20].   Although Plaintiff rated her back pain as 2 out of 10 at that visit, she stated that certain movements made it worse and reported that, although she had previously been able to walk for an hour at a time, she currently could only walk for about 15 minutes due to the pain.   *Id*.   Then, in September 2013, Plaintiff injured her right knee, reporting that she "may have twisted her knee during aerobics." *Id*. at 5.   On October 7, 2013, Plaintiff went to the Emergency Room due to pain in her right knee, following-up the E.R. visit with Ms. Doucette on October 21, 2013.   *Id*. at 10-12.   During this visit with Ms. Doucette, Plaintiff indicated that:

> She was seeing Dr. Diaz in Psychiatry, who discharged her, as she was stable.   She
> notes she is not doing very well right now.   She stabbed her left arm with a fork.
> She has also burned her arms and she tries to hurt herself to feel, so that she
> removes the thoughts of suicide.   She is trying to get a walking partner.   She has
> the number to the suicide hotline.   All guns and knives have been removed from
> her home.   Her children help her with her meds to avoid that temptation of taking
> her pills.   She is followed routinely by Dr. Ne[u]man[n] in psychology.   Her next
> followup is 10/31/2013.   They moved to monthly appointments.   She wants to get
> rid of the depression that she has.   She notes the medications initially seemed to be
> helping.   They do not seem to be working as well anymore.   She is on Effexor,
> trazodone and BuSpar.   She has been on multiple medications in the past.   She
> reports decreased interest, crying and decreased energy.

*Id*. at 11.   Ms. Doucette also noted that Plaintiff was then "working from 7:00-12:00 a.m. [sic] at a

Baptist church helping in the kitchen" but that "[i]t has been difficult with her knee pain."   *Id*.

Ms. Doucette indicated that she would refer Plaintiff back to Dr. Diaz in psychiatry to reevaluate

Plaintiff's medications and that, although Plaintiff was still seeing Dr. Neumann, they may want to

consider more frequent appointments.   *Id*. at 12.

At the hearing in November 2013, Plaintiff testified that, post-onset, she had worked at a

childcare center in early 2012 (*Doc. 15-4* at 10), in a church nursery on Sundays during Mass in

mid-2012 (*id*.) and adding similar work for a synagogue nursery on Saturdays, beginning in

late 2012 (*id*. at 11), and had worked as a cook at a childcare facility, five hours per day, for two

months in early 2013.[6]   *Id*. at 11-12.   At the time of the hearing, Plaintiff had been working for

slightly more than a month as a cook at a Christian school, also for five hours a day, five days a

---

[6] In 2013, Plaintiff briefly worked for Busy Bees Childcare facility, but she was terminated in April 2013
due, at least in part, to her repeated absences.   *See* [*Doc. 15-23* at 29, 34, 38].   At the hearing, Plaintiff also testified
that the Busy Bees job was terminated after her supervisor had noticed that, due to pain in her back, Plaintiff could not
lift much without help.   [*Doc. 15-4* at 12].

week.  *Id*. at 12-13.   Plaintiff testified that her back and knee pain, as well as depression, caused her problems at her Christian school job, and that during the short time she had worked there, she had already missed eight days of work.   [*Doc. 15-4* at 18].   Plaintiff testified that she sometimes cries for days and stays in bed because her depression gets so bad that she has to fight with herself "not to commit suicide."   *Id*. at 16.   During these depressive episodes, Plaintiff does not drive because she has thoughts of hurting herself by running her car into a wall and would not want to hurt anyone else.   *Id*. at 18-19.   Plaintiff's description of a "typical" day begins with concerted efforts to keep her thoughts positive, followed by going to work, coming home and watching TV in bed, taking a nap, going outside to see her flowers and pray, knitting or doing yoga, having dinner, and going to bed.   *Id*. at 22-23.

In response to the ALJ's specific questions, Plaintiff agreed that she goes with her daughter to get groceries,[7] does laundry, does sweeping and vacuuming, but does not pay or keep track of household bills.   [*Doc. 15-4*. at 19-20].   Plaintiff responded that, "for exercise," she walks (*id*. at 21), later indicating that walking causes her both back and knee pain, but she does it "because it takes me away from the thoughts that I have."   *Id*. at 27.   However, in response to the ALJ's query regarding how much she walked at that time, as opposed to the two miles, three times a week she had claimed to walk in 2010, Plaintiff indicated that she was only able to walk about one-half mile, once a week.   *Id*. at 21.   Plaintiff also testified that she works alone at her job and "can't be

---

[7] Plaintiff subsequently clarified that she only goes grocery shopping with her daughter about "once a month," although her daughter goes about ten times in a month (*Doc. 15-4* at 34), and that she does her own laundry but that, when she is depressed or in pain, her household chores do not get done.   *Id*. at 35, 46-47.

around people," but that serving food to children is alright for her because "[t]hey don't judge me." *Id*. at 28-29.   If Plaintiff goes where there are people, she sometimes has panic attacks and has to leave.   *Id*. at 30-31.   During the panic attacks, which usually last about 2-3 hours, Plaintiff has to stop what she is doing and use calming techniques, such as squeezing an object or yoga.   *Id*. at 32. Plaintiff described her back pain as "stabbing," and said that the pain goes down her legs when she does too much lifting.   *Id*. at 36.   The most she attempts to lift is 15 pounds, and "[t]hat's pushing it."   *Id*. at 38.   Plaintiff indicated that her left knee was "good" post-surgery, but that her right knee was going to need surgery as well, which her doctor was attempting to schedule.[8]   *Id*. at 44-45.

Quite simply, the ALJ's description of Plaintiff's activities does not fairly represent the evidence.   Although the ALJ considers Plaintiff to be "not entirely credible" regarding her limitations, it appears from the lengthy medical records that Plaintiff is a remarkably candid reporter of her symptomology, both good and bad.   If Plaintiff is not experiencing any pain, she reports that, as she did after both her left knee and wrist surgeries.   *See* [*Doc. 15-18* at 46 ("pain is minimal" approximately two weeks after knee surgery); [*Doc. 15-16* at 5] (patient reports pain is "markedly less" than before, less than one month after wrist surgery).   Similarly, at a visit with

---

[8] This statement, made at the hearing, belies the ALJ's claim that, beyond the scheduling of an MRI of Plaintiff's right knee, "no further evidence concerning the [Plaintiff]'s knee or back pain have been provided." [*Doc. 15-3* at 27].   Plaintiff testified that she had "a torn meniscus" in her right knee, and that the doctor had called her the day of the hearing "and they're making an appointment to see when they could schedule [surgery]." [*Doc. 15-4* at 44-45].   In any event, Plaintiff's primary care provider only ordered a right knee MRI on or after October 21, 2013, 15 days prior to the ALJ hearing.   Thus, it is clear that Plaintiff was not holding back any documentation.

Ms. Doucette in August 2013, at which her chief complaint was low back pain, Plaintiff honestly

rated her lower back pain at the time of the visit as 2 out of 10, then explained that the pain worsens

with certain movements and that it had decreased her previous ability to walk.   [*Doc.15-25* at 20].

It is important to note that the ALJ found that Plaintiff had met the objective evidence threshold, as

"[t]he medical evidence of record reflects that [she] suffers from conditions known in some

circumstances to be productive of inability to perform physically strenuous or heavy work."

[*Doc. 15-3* at 26].   Thus, the ALJ must consider all relevant evidence in determining whether

Plaintiff is "disabled."   Significantly, the ALJ noted that there are "numerous factors that agency

decision makers should consider when determining the credibility of subjective claims of pain,

*e.g.*, a claimant's persistent attempts to find relief, his willingness to try any treatment prescribed,

and his regular contact with a doctor."   *Id.* (citing *Luna v. Bowen*, 834 F.2d 161, 165-66

(10th Cir. 1987)).   Oddly, however, the ALJ apparently did not consider the very factors that she

referenced in her consideration of Plaintiff's credibility.   The medical records strongly indicate

that all three of the *Luna* factors apply to Plaintiff.   First, Plaintiff persisted in seeking relief.   In

fact, her left knee injury was originally diagnosed as a "sprain" and treated only with Ibuprofen,

yet an MRI, performed because of Plaintiff's continued complaints of pain, established that she

had a torn meniscus that required surgery.   Plaintiff has also demonstrated her willingness to try

any treatment prescribed.   Thus, Plaintiff has on many occasions discussed with her medical

providers the techniques she uses to calm herself that were suggested to her by her therapists.   She

submitted to two successful surgeries.   She attempts to walk and use portion control because her

providers have told her that losing weight might help her with the pain.   She has submitted to

every test and procedure her doctors have prescribed and, more often than not, those tests and

procedures have verified, rather than discounted, her complaints.   Finally, Plaintiff has had almost constant contact with her medical and psychiatric providers.   In the year between her overdose and the hearing, Plaintiff had seen her primary care provider and several mental health providers numerous times.   In fact, Plaintiff had been seen by Ms. Doucette, her primary care provider, on a regular basis since at least May 2010 (*See Doc. 15-11* at 49), in addition to spending three days in the hospital following an overdose.   The ALJ's failure to discuss these factors with respect to Plaintiff's medical care seriously undermines her ultimate conclusion that Plaintiff was "less than credible."

It also appears that the ALJ picked through the medical records to find examples of activities that appear inconsistent with Plaintiff's claims.   Because the ALJ must consider the whole record, she is prohibited from picking and choosing "among medical reports, using portions of evidence favorable to h[er] position while ignoring other evidence."   *Carpenter v. Astrue*, 537 F.3d 1264, 1265 (10th Cir. 2008) (citation and internal quotation marks omitted).   Thus, the ALJ stated that Plaintiff "walks, bikes, and has taken aerobics."   [*Doc. 15-3* at 29] (citing [*Doc. 15-25* at 5, 10; *Doc. 15-17* at 22; *Doc. 15-23* at 22]).   However, Plaintiff testified at the hearing that her walking time had been significantly reduced and she was limited to about 15 minutes of walking once a week.   [*Doc. 15-4* at 21].   On August 30, 2013, she reported to Ms. Doucette the same reduction in her ability to walk.   [*Doc. 15-25* at 20].   Although that minimal amount of walking caused her lower back and knee to hurt, she did it anyway because it helped remove her from her self-destructive thoughts.   [*Doc. 15-4*. at 27].   Moreover, Plaintiff had been advised to walk by her care providers.   *See, e.g.,* [*Doc. 15-17* at 20; *Doc. 15-20* at 26; *Doc. 15-24* at 6 and 21].

There appears to be only one superficial reference to Plaintiff "biking" in the entire record. At an initial evaluation of Plaintiff for physical therapy, in February 2012, the evaluator noted that Plaintiff "had injury to the back about ten years ago.  She was doing some self[-]stretching and walking, biking."  [*Doc. 15-17* at 22].   Although it is vague, this statement appears to refer back to when Plaintiff injured her back ten years earlier, rather than evidence that she was biking in 2012.   In any event, Plaintiff did not mention biking when asked about her activities, nor did any other provider.   That the ALJ would use this single, non-specific reference as evidence of an activity of daily living that was inconsistent with Plaintiff's claimed activity level strongly suggests that the ALJ was picking and choosing "facts" that supported her conclusion, rather than performing an objective review of the evidence.   Moreover, if the ALJ had the idea that Plaintiff was "biking," she could easily have asked her for information about that activity at the hearing. Details such as when the activity took place, whether it was on a bicycle or a stationary bike, for how long a period she did it, and how intense the exercise was could have been very helpful to the ALJ's determination of whether or not that activity rendered Plaintiff's claims "less than credible."

The ALJ similarly included a single reference to Plaintiff "planning to do a 5K with her daughters" as evidence of Plaintiff's "higher level of functioning."   [*Doc. 15-3* at 29].   This statement was taken from Ms. Doucette's notes of an April 2013 visit with Plaintiff, which was already discussed.   Plaintiff was particularly upbeat around that time; feeling better and more positive.   However, as previously noted, she was significantly less than that way a very short time thereafter.   Again, no detail about this planned activity is in the record, so it cannot be determined when it was supposed to take place, or even whether Plaintiff actually took part in it.   Moreover, the ALJ's statement regarding this activity conveniently omits that it was a 5K "walk," rather than

a run.   That someone with Plaintiff's psychological difficulties might plan to do something completely beyond her ability to do on an "up" day is hardly surprising.   What is surprising is that the ALJ would use two isolated references to activities, about which no detail is given, as suggestive of Plaintiff's lack of credibility.   Again, if the ALJ was concerned about this activity, she should have asked Plaintiff about it at the hearing, particularly since Plaintiff herself volunteered the information in the first place.   If Plaintiff was attempting to exaggerate her pain and minimize her activity level, one would expect her to do so a little more consistently.

On the other hand, Plaintiff's participation in an aerobics class in which she injured her right knee, though also an isolated reference in her medical records, might well indicate a higher-than-claimed activity level.   However, here again, there is virtually no context within which to make such a determination.   The ALJ did not ask Plaintiff about this activity, either to describe the class or to inquire why Plaintiff would engage in such an activity.   As it was in the records submitted for the hearing, it would have been simple and sensible for the ALJ to seek additional information from Plaintiff regarding activities she found troubling, rather than simply relying on them without any context.   Simply stating that Plaintiff "had taken aerobics," without more, is misleading.[9]

Finally, the ALJ noted that Plaintiff "admitted to" both "doing yoga" and "caring for her nieces 40 hours a week."   [*Doc. 15-3* at 29].   Doing yoga, particularly as Plaintiff described it as

---

[9] For all the ALJ knew, Plaintiff's aerobics class may have been specifically for people with back injuries, or for beginning students who were cautioned to participate only to the extent they were able.   It also may have been the only aerobics class in which Plaintiff ever participated, or a low-impact water aerobics class.   The only reason why there are no details about Plaintiff's aerobics activity is that the ALJ did not ask for them.

a relaxation technique, hardly seems like an "admission."   This is an activity that Plaintiff actually described doing at the hearing, yet again the ALJ asked for no additional information regarding the exertion level of Plaintiff's yoga.   Yoga does not necessarily require physical exertion. Similarly, the reference to Plaintiff "caring for her nieces" is made without context.   It does not indicate how many nieces Plaintiff watched, nor how old they were.   It also does not indicate just how much, or what kind of, "care" her nieces required.   Finally, it does not indicate for how long, or how well, Plaintiff did this activity.   Without such details, it is impossible to ascertain whether these activities indicate that Plaintiff has greater functionality than she claims.   Accordingly, the ALJ's reliance on them to discredit Plaintiff's subjective pain reports is troublesome.

Although credibility is "peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence," it is also the case that credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."   *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (citations and internal quotation marks omitted).   Here, as in *Kepler*, the link between the ALJ's determination that Plaintiff was not credible and the evidence in support of such determination is missing, leaving this Court with nothing but a conclusion.   The ALJ's statements regarding Plaintiff's credibility are both too superficial and too incomplete to provide an adequate basis for denial of disability.   This is legal error, and requires remand for additional consideration of the credibility issue.

## B.   The ALJ's Assessment of Dr. Gelinas' Opinion

The ALJ must base her RFC assessment on all of the relevant evidence in the record, such as medical history, laboratory findings, effects of treatment and symptoms, including pain, reports

of daily activities, lay evidence, recorded observations, medical source statements, evidence from attempts to work, need for a structured living environment, and work evaluations, if any. Soc. Sec. Rep. 96-8p at *5.   "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.,* laboratory findings) and nonmedical evidence (*e.g.,* daily activities, observations)."   *Id*. at *7.   The ALJ "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved," and the RFC assessment must always consider and address medical source opinions.   *Id*.   Because the ALJ must consider the whole record, she is prohibited from picking and choosing "among medical reports, using portions of evidence favorable to his position while ignoring other evidence."   *Carpenter v. Astrue*, 537 F.3d at 1265 (citation and internal quotation marks omitted).   When there are multiple opinions regarding medical severity and functional ability from different sources, the ALJ must explain the weight given to each source's opinions.   *Hamlin*, 365 F.3d at 1215 (citation omitted).

In her decision, the ALJ granted "the greatest weight" to the "opinions of the experts who prepared the State Agency (DDS) reports" on Plaintiff's claims at the Commission's initial and reconsideration stages   [*Doc. 15-3* at 30].   At the initial stage, Plaintiff's claims of physical impairments were reviewed by Karen Schnute, M.D., who concluded that Plaintiff was, at that time, capable of performing work at a medium exertional level.   [*Doc. 15-5* at 2-3 and 12]. Plaintiff's claimed mental impairments were reviewed at the initial stage by Thomas VanHoose, Ph.D., who concluded that her mental impairments were all non-severe.   *Id*. at 12.   At the reconsideration level, evaluations of Plaintiff's physical and mental impairments were provided by Allen Gelinas, M.D. and Arthur Hamlin, Psy.D., respectively.   [*Doc. 15-5* at 5-23]   Based on his

review of additional medical evidence, Dr. Gelinas determined that Plaintiff was limited to work at a light exertional level with only occasional climbing, kneeling, crouching, and crawling.   *Id.* at 16.   Dr. Hamlin concluded that Plaintiff had a severe affective disorder, leading to mild restriction of her activities of daily living (hereinafter "ADL"), moderate difficulty with social functioning, and moderate difficulty with concentration, persistence, or pace.   *Id.* at 13-14. Dr. Hamlin opined that Plaintiff "would likely have some difficulty adapting to change but should [be] able to function with a stable, low-stress work setting."   *Id.* at 21.

Plaintiff contends that the ALJ failed to discuss a portion of Dr. Gelinas' evaluation that did not support her decision.   After noting that Plaintiff's impairments had worsened since the initial evaluation, due to diagnoses of degenerative joint disorder of the lumbar spine and having had left knee surgery on May 9, 2012, and downgrading Plaintiff's physical RFC to "light work," Dr. Gelinas noted that Plaintiff "will retain capacity of this RFCF [sic] within 12 months from her knee surgery."[10]   [*Doc. 15-5* at 18-19].   Plaintiff asserts that what Dr. Gelinas meant by this statement was that Plaintiff "would not retain the ability to perform light work for up to twelve months after May 24, 2012 – [she] was either reduced to sedentary work or **completely disabled** during this time."   [*Doc. 19* at 18].   The Court finds this interpretation of Dr. Gelinas' statement to be unpersuasive.   The fact that Dr. Gelinas downgraded Plaintiff's ability to perform work

---

[10]   The substance of this statement was repeated in the analysis of Disability Adjudicator/Examiner, Margaret Mathis, in which she stated that Plaintiff had been diagnosed with a severe impairment that does not meet a listing "but does restrict her to unskilled light level work as of 05/08/2013 (1 year from left knee surgery)." [*Doc. 15-5* at 13].   Although this rephrasing is unfortunate, it does not appear to have been made by Dr. Gelinas, nor does it convince the Court that either Ms. Mathis or Dr. Gelinas believed that Plaintiff's knee condition would restrict her to *less than* "light work" until May 2013.

from medium to light, was based, at least in part, on the fact that Plaintiff had recently had knee surgery.   The only way his statement can reasonably be interpreted is that Plaintiff's RFC for light work would only last for 12 months post-surgery, in order to give her time to heal.   If Dr. Gelinas believed that Plaintiff's physical abilities would be at less than his expressed assessment of "light work" for nearly a year after the assessment was made, he could and should have stated that clearly and not assessed Plaintiff as having the abilities necessary to perform light work in his "current evaluation."   There is simply nothing in his assessment to suggest that Dr. Gelinas considered Plaintiff to be either disabled or fit only for sedentary work.   Therefore, the Court determines that this ground for reversal of the ALJ's decision is without merit and will be denied.

### C.   The ALJ's Assessment of the Opinions of Dr. Neumann and Dr. Rittenhouse

Plaintiff contends that the ALJ failed to appropriately weigh Dr. Neumann's opinions and to provide specific reasons for apparently discounting them. [*Doc. 19* at 20-22].   As Plaintiff's treating psychologist, who saw Plaintiff on many occasions for therapy, Dr. Neumann is considered a "treating physician," whose opinions are generally given controlling weight.   *See* 20 C.F.R. §§ 404.1527(d) and 416.927(c).   This consideration is commonly called the "treating physician rule."   *See* Soc. Sec. Rep. 96-2P, 1996 WL 374188 at *1 (1996) ("If a treating source's medical opinion is well- supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; *i.e.,* it must be adopted").   The Tenth Circuit Court of Appeals explains the "treating physician rule," as follows:

> The treating physician's opinion is given particular weight because of his unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.   The opinion of an examining physician is generally entitled to less weight than that of a treating physician, *and*

> *the opinion of an agency physician who has never seen the claimant is entitled to*
> *the least weight of all.*

*Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (emphasis added) (citations and internal quotation marks omitted).  *See also Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (an examining medical-source opinion is given particular consideration and is presumptively entitled to more weight than a doctor's opinion derived from a review of the medical record).

Even where the ALJ determines that a treating source's opinion is not entitled to controlling weight, the opinion is still entitled to deference and must be weighed using the following factors:

> The   [20 C.F.R.] § 404.1527  factors are:   (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Bainbridge v. Colvin*, 618 F. App'x 384, 389-90 (10th Cir. 2015) (unpublished).   In this case, the only opinions regarding Plaintiff's mental functioning were provided by Dr. Neumann, her treating psychologist, Dr. Rittenhouse, an examining psychologist, and Drs. VanHoose and Hamlin, who are both non-examining psychologists.

Indeed, the ALJ apparently disregarded Dr. Neumann's opinions entirely, without even indicating how much weight she had given them, and while also giving "the greatest weight" to the non-examining Disability Determination Services doctors.   [*Doc. 15-3* at 30].   Dr. Neumann was Plaintiff's treating psychologist, and the *only* treating medical source that provided an opinion

on Plaintiff's mental functionality.[11]   The ALJ's failure to assign a weight to Dr. Neumann's opinion is itself grounds for remand, but her additional failure to give valid reasons for discounting an opinion that would ordinarily be controlling is even less supportable.   The ALJ apparently disregarded Dr. Neumann's opinions because they conflicted with her own flawed interpretation of Plaintiff's activity level.   Thus, she broadly generalized that "Dr. Neumann's opinions are not supported by the evidence of record as a whole," then notes how his assessment conflicts with her own views that Plaintiff does not have difficulty with social functioning because she works,[12] and does not have difficulty leaving her home at times because "she *admitted* she can go shopping, works, and has never been fired from a job because of problems getting along with others." [*Doc. 15-3* at 30] (emphasis added).   The ALJ similarly disregarded Dr. Neumann's opinion that Plaintiff has marked restriction in her ADL because Plaintiff "has described activities, which are not limited to the extent one would expect based on the doctor's opinion."   *Id*. at 30-31.   Such

---

[11]  In December 2013, Dr. Neumann filled out assessments regarding the effects of Plaintiff's anxiety and depression, which were provided to the ALJ after the hearing.   *See* [*Doc. 15-25* at 42-45 (anxiety), and 48-51 (depression)].   The anxiety assessment indicated marked restriction of Plaintiffs ADL, social functioning, concentration, persistence and pace, as well as repeated episodes of decompensation of extended duration, and the depression assessment indicated that Plaintiff's depression was characterized by anhedonia (inability to feel pleasure), sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide.   *Id*.

[12]  Using the fact that Plaintiff has attempted to work during the claimed disability period is especially disingenuous in that the ALJ specifically found that Plaintiff had "not engaged in substantial gainful activity" since her alleged disability onset date.   [*Doc. 15-3* at 22].   The ability to keep such jobs for limited periods is hardly substantial evidence that Plaintiff is capable of performing work in a competitive environment, especially since Plaintiff described at least two jobs that she had lost due to her disabilities (*i.e.*, Plaintiff was unable to return to her job as a cook at a child care facility (St. Mark's) in March 2011 after she was confronted by her supervisor (*Doc. 15-4* at 32-33), and Plaintiff was terminated from her daycare job in 2012 for missing work too frequently even though she provided a note from her primary care provider regarding her final absence (*Doc. 15-23* at 29)).

commentary does not establish that Dr. Neumann's opinion is "not supported by the record," only that his opinions are not shared by the ALJ.   Thus, the ALJ "impermissibly substitutes her judgment for that of [a medical source]."   *See Thomas v. Barnhart*, 147 Fed. App'x. 755, 760 (10th Cir. 2005) (unpublished).   Suffice it to say that Dr. Neumann, a trained psychologist who had treated Plaintiff's mental impairments for nearly a year prior to the ALJ hearing, undoubtedly knew more about Plaintiff's ADL than did the ALJ.   The ALJ's disregard of Dr. Neumann's opinions in favor of non-examining consultants violated the treating physician rule and is grounds for remand.

JoAn Rittenhouse, Ph.D. provided a consultative mental examination of Plaintiff in March 2012, between the initial denial of Plaintiff's claim and the reconsideration of it. [*Doc. 15-17* at 31-33].   The ALJ gave Dr. Rittenhouse's opinions "limited weight," because "[t]he doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by the [Plaintiff], and seemed to uncritically accept as true most, if not all, of what the [Plaintiff] reported."   [*Doc. 15-3* at 30].   In addition, the ALJ described Dr. Rittenhouse's opinion as "quite conclusory, providing very little explanation of the evidence relied on in forming that opinion."   *Id.*   In her report, however, Dr. Rittenhouse gave brief personal, medical, and work histories for Plaintiff, followed by a mental status examination in which Dr. Rittenhouse related her appraisals of Plaintiff in the following categories:   appearance, attitude, and behavior; orientation; mood; affect; thought process; thought content; speech; memory; judgment and insight; concentration and attention; intelligence; and emotional/mental symptoms.   [*Doc. 15-17* at 31-33].   Dr. Rittenhouse's statements about Plaintiff in these categories involved her observations ("[Plaintiff] is an obese woman, (5' 2", 220 pounds) who has a severe limp and

unsteady gait," interaction with Plaintiff ("speech was somewhat slurred although understandable"), and testing ("[Plaintiff] failed both digit span tasks.   She could give a clear and coherent statement of her current situation.   She could not recall 3 objects on retest").   Dr. Rittenhouse listed her diagnostic impressions of Plaintiff as "Major depression, recurrent," and "[rule out] developmental learning problems," and described Plaintiff's current functioning as follows:

> [Plaintiff] reports she can do laundry and cook, but often when she tries to go to the grocery store she has to leave because she's fearful when there are too many people in the store.   She relates socially primarily to her younger daughter.   Her depression impacts her ability to work in the areas of contact with others, regular attendance to work, completing job tasks and concentration on work.   Her difficulties with reading and writing impair her ability to do most desk jobs.
>
> [Plaintiff] has the ability to handle her own finances and benefits.

*Id*. at 33.

The ALJ's objection to Dr. Rittenhouse's opinion appears primarily to be that the opinion is too heavily reliant on Plaintiff's subjective reports.   However, a psychologist's reliance, in part, on a patient's subjective reports is not a proper basis upon which to disregard her opinions.   *See Thomas*, 147 Fed. App'x. at 759-60.   Thus, to the extent that the ALJ discounted Dr. Rittenhouse's opinions simply because they included information provided by Plaintiff (*Doc. 15-3* at 30), this is error.   "The practice of psychology is necessarily dependent, at least in part, on a patient's subjective statements," and an "ALJ cannot reject [a medical source's] opinion solely for the reason that it was based on [the Plaintiff's] responses because such rejection impermissibly substitutes her judgment for that of [the medical source]."   *Thomas*, 147 Fed. App'x. at 759-60; *see also Angster v. Astrue*, 703 F. Supp. 2d 1219, 1230-31 (D. Colo. 2010) (same).   In any event, the record in this case does not support a finding that

Dr. Rittenhouse unduly relied on Plaintiff's subjective reports.[13]   Rather, Dr. Rittenhouse clearly based her opinions on her examination, assessment, and testing of Plaintiff.   Moreover, as did the ALJ in *Thomas*, the ALJ here gave greater weight to the opinions of a non-examining source, Dr. Hamlin, than to Dr. Rittenhouse, an examining source, even though, "a consulting, examining physician's testimony is normally supposed to be given more weight than a consulting, non-examining physician's opinion."   *Id*. at 760 (citation omitted).   When an ALJ rejects an examining source's opinion in favor of a non-examining source's opinion, she "must give adequate reasons" for doing so.   *Id*.   Here, the ALJ's additional reasons for discounting Dr. Rittenhouse's opinions, are that "there exist good reasons for questioning the reliability of the [Plaintiff]'s subjective complaints," and that "the opinion expressed is quite conclusory, providing very little explanation of the evidence relied on in forming that opinion" (*Doc. 15-3* at 30).   As previously discussed, neither of these reasons appears to be valid.   Therefore, this is legal error, and requires remand for additional consideration of the credibility issue.

---

[13] It is notable that Plaintiff's medical records do contain "objective" evidence regarding her mental functioning, yet the ALJ did not discuss that evidence at all   On November 9, 2012, Leslie Kern, RN-BC performed a battery of psychological tests on Plaintiff, which scored her on, among other things, schizophrenia symptoms, literacy, cognitive impairment, depression, and anxiety.   [*Doc. 15-20* at 9-13].   Plaintiff's BPRS-Schizophrenia Subscale score of 11 was borderline for schizophrenia symptoms ($\geq$ 11) (*id*. at 9), her REALM score of 4 indicated she was at risk for poor literacy ($\leq$ 6) (*id*.); her score on the MOCA test was 19, well below the guideline of 26, which indicates cognitive impairment (*id*. at 10); her PHQ-9 score of 24 was in the severe depression range of 20-27 (*id*. at 11); and her GAD-7 score of 17 indicated severe anxiety (>15) (*id*. at 12).   These tests were performed only 17 days after Plaintiff's release from the hospital following her overdose, and 18 days after she was assessed in a psychiatric consult note, by an apparently un-credentialed evaluator, with a GAF of 90 (*Doc. 15-21* at 25), which the ALJ did mention (*Doc. 15-3* at 28).   Remarkably, that GAF score appears to be higher by at least 50% than any other GAF score Plaintiff had ever received.

# VI.   Conclusion

For the reasons stated above, the Court **FINDS** that the Commissioner's decision should be remanded for further proceedings, including proper consideration of the opinions of Drs. Neumann and Rittenhouse and Plaintiff's credibility.

**IT IS THEREFORE ORDERED** that Plaintiff's ***Motion to Reverse and Remand for a Rehearing With Supporting Memorandum*** (*Doc. 19*) is **GRANTED in part** and this case is **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.   A final order will be entered concurrently with this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

_Lourdes a. Martinez_
**LOURDES A. MARTÍNEZ**
**UNITED STATES MAGISTRATE JUDGE**
**Presiding by Consent**